CARRIE BROWN ET AL. v. MICHAEL BROWN ET AL.

[See 54 Mich. 617.]

*Executors and administrators—Sale of pine 'land on contract—*
*Fraud.*

1. Upon a review of the testimony (see opinion),—

    *Held,* that no fraud was made out on the part of the executors in making the sale, and the decree of the lower court dismissing. the bill was affirmed.

2. Where executors, under a power of sale in a will, sold a tract of pine land on contract, and afterwards filed a bill for the construction of the will as to their rights under such power, and,. pending a decision, completed the sale by a conveyance of the land to the vendees, and subsequently certain of the legatees filed a bill to set aside the sale for alleged fraud on the part of. the executors in making same,—

    *Held,* that the *completion* of the sale before such decision had. no bearing on the question of *actual* fraud in agreeing upon the *original* terms of sale, the contract being in force ; and it not. ' appearing that the purchasers had any knowledge of such suit, but that all parties relied on the power as *actually* given in carry-- ing out such contract.

Appeal from Kalkaska. (Judkins, J.)    Argued October 26 and 27, 1886.    Decided January 6, 1887.

Bill to set aside a sale of pine land by executors for-fraud.    Complainants appeal.    Decree dismissing bill af--firmed.    The facts are stated in the opinion.

*R. W. Butterfield* (*Hanchett & Stark,* of counsel), for-complainants.

*More & Wilson,* for defendants Brown and Palmer.

*Edwin F. Uhl,* for defendants Phippen and Crawford.

*M. J. Smiley* and *Samuel T. Douglas,* for defendant Rug-glcs.

CAMPBELL, C. J.  The bill in this cause, which was dismissed as to all parties in the circuit court for the county of Kalkaska, was brought to set aside a sale of pine lands made by John F. Brown's executors to George W. Crawford and William E. Phippen, and conveyed to Charles F. Ruggles by them at an advance.  The bill is based on charges of fraudulent combination between the executors and their vendees, and Ruggles is charged with having bought under circumstances which deprived him of the claim of a *bona fide* purchaser without notice of the fraud.

As the case must depend on the issues made, as well as upon the facts bearing on them, it is necessary to consider the grounds of complaint, which were substantially these:

1. An excess of power in selling at private sale.

2. That the sale was made without adequate security, and for inadequate consideration, without publicity, and for sinister purposes, which are charged on information and belief to have been personal gain.

3. That Ruggles knew the facts and character of the sale.

In brief, the causes of complaint are lack of power to sell and actual fraud in selling.  No other case is averred.

John F. Brown, who lived at Big Rapids, had, in addition to large personal estate, a mill and various considerable interests in pine lands and the means of lumbering, and, among other lands, owned the whole of a tract lying in Kalkaska and Missaukee counties, embracing some 1,900 acres, or thereabouts, which is the subject of this controversy.  He died March 30, 1881, leaving defendants Palmer and Michael Brown as his executors and trustees to carry out his will. This will empowered the executors to sell or dispose of any of his property—

"At public or private sale, at such time or times, and upon such terms and in such manner, as to them, acting in good faith and using their best judgment, shall seem meet."

The will was probated, and the executors qualified on May 26, 1881.

On July 29, 1881, they made a written contract to sell these lands to Crawford and Phippen for $40,000, payable, one-fourth down, and the rest in two, four, and six months, with eight per cent. interest on all until paid. Phippen and Crawford subsequently bargained with Ruggles, on November 26, 1881, for $80,000. No money was paid to the executors until the sale was closed with Ruggles, who paid the amount of principal and interest to the executors, and the balance to Crawford and Phippen, and the executors deeded to their own vendees, who conveyed to Ruggles by warranty deed. Some delay occurred in getting Brown's title cleared on the record, and one-twentieth interest remained unrecorded.

The testimony is voluminous, and in some things inconsistent, and the record contains a good deal of matter that does not now seem material. It will not be necessary or desirable to discuss it much at length. The outlines are sufficiently defined to make a more general statement of results sufficient.

The first objection, of want of power, which seems to have been a principal reliance when the bill was filed, is not now relied on, inasmuch as the question was decided by this Court in favor of the power in *Palmer v. Keam,* 54 Mich. 617. The bill in that case was filed in September, 1881, to get a construction of the will, and it is claimed the pendency of that suit should have hindered the completion of the sale. But as the contract of sale was already in force, and there is no testimony tending to show that the other defendants had any knowledge of the pendency of such a suit, it can have no bearing on the question of actual fraud in agreeing upon the terms of the sale in the first place. All parties relied on the power as actually given.

The question of fraud is therefore the only one to be considered.

The bill contains no averments to indicate in what the supposed fraud consisted, beyond a general averment of inade-

quacy, and a suggestion that the executors were interested. It is not averred that the property, when sold to Phippen and Crawford, was worth what Ruggles gave for it, or any other sum. The bill contains no reference to any attempts by others to purchase, or any particular wrong-doing. It does not aver anything issuable or tangible on the facts of misconduct. The testimony covers a great many matters out of which, if at all, the fraud is to be deduced or inferred.

There is nothing that we have found in the record which seems to us to have any tendency to show that the executors received or expected any advantage from the sale. It appears very satisfactory that they did not. It appears, and we think it is true, that Mr. Palmer, after the sale at an advance to Ruggles, felt desirous that the arrangement might be given up. The testimony indicates that this was an honest feeling of desire that the estate might in some way profit by a higher market. But we do not think the executors were in fault for carrying out their bargain, if honestly made to begin with.

It is undoubtedly true that if Phippen and Crawford were in default in their payments, inasmuch as no advance had been made, it would have required but slight evidence of sharp dealing to authorize a court of equity to decline specific performance. But in this case the interest carried by the contract was larger than the current prices of money at that time, and there is no dispute in the testimony that the delay was agreed to for the reason that no more profitable use of the money was then attainable. The case was not one where time was, under these circumstances, of the essence of the contract, and there was no such default as to forfeit the agreement.

The only remaining ground of fraud is the inadequacy of consideration. As already suggested, the bill is very defective on this head. But the facts have been quite fully introduced, and are before us.

The claim on the argument was that the lands in question contained not far from 40,000,000 of pine, of which about one-third was Norway, and the rest a good quality of common white pine; that this was reasonably worth at least three dollars a thousand standing; and that the executors knew or should have known it, and could not have made the sale they did honestly.

Upon a fair review of the testimony, we do not think that this large estimate of quantity or value can be said to have been either true in fact, or such that the executors should have assumed it. The witnesses vary considerably in their guesses,—to such an extent as to show that they are all conjectural, and dependent on good judgment. There is reason to believe that the land contained at that time not far from 30,000,000 feet of such lumber as would be available for use. But it is also evident that the variation between the old and new estimates was due somewhat to the fact that several years earlier trees not measuring 12 inches in diameter at the smaller end of the cuts were not marketable, while now timber is valuable, in long pieces, which is not more than eight inches in diameter, and some of the estimates seem to include still smaller trees.

So far as value is concerned, the weight of testimony is that it is affected and largely governed by the expense of getting it to a place of destination, where it will have an established market value. These are the two questions at which most of the testimony is aimed.

It appears that these lands were bought by Mr. Brown, several years before his death, from the Tioga Manufacturing Company, upon an estimate made by one Aitken, with which both parties were satisfied, and which seems to have been made honestly, and upon proper examination. One or two sales were made by Brown to other parties in reliance, so far as he was concerned, on these same estimates, with which he never seems to have found fault. Mr. Brown lumbered on

the tract containing these lands, so that out of about 2,900 acres left him he had cut about 1,080, leaving the remainder that the executors sold. On the lands so remaining the Aitken estimate left not far from 20,000,000 standing. Some of the testimony indicates a reduction on this.

It appears, also, that during his life Mr. Brown did not find lumbering these lands profitable; and before his death he desired to sell out these as well as his other lumbering interests, and realize upon them. We think it is established that he was willing to sell these lands at $30,000.

The witnesses put the value of the pine on this tract at rates varying from $1.50 upwards. The situation was not far from a creek called Cannon creek, which, if floatable, would have made the transit cheap; but we think it proven that this stream was useless for floatage. By land carriage the distance was considerable to the Manistee river, down which the logs were to be run, and the country not very favorable, being a good deal broken. The witnesses agreed that, if a railroad were practicable, the carriage would be more economical; but, while there is some conflict in this, the facts satisfy us that no one could afford to put in a rail or tram way merely to get out the lumber from this tract, although, if owning adjacent lands to any large extent, it might be done.

In the conflict of testimony, arising from different estimates on this subject, we do not think that the executors had any reason to assume the pine was worth any more than two dollars a thousand, if it was worth that.

It is evident that the executors considered it desirable to dispose promptly of the lumbering interests of the estate. Neither of them seems to have been very much experienced in lumbering matters, and the efforts made to ascertain values and secure bidders did not bring in any large bids. There is some confusion in the statements of various witnesses concerning their own conversations, but, when all are compared,.

it does not appear to us as probable that any better offer was supposed to have been made, or was made in fact. Some, which were apparently made with a hope that they would be accepted, were many thousand dollars below the price which they secured.

Phippen and Crawford endeavored to get the land at the price which Brown had favorably considered, of $30,000. This the executors refused, and finally offered to take $40,000. It appears that the purchasers were not willing to accept this without further examination, and that, on such examination, they became satisfied the estimates were low, and the price such as to make the purchase a profitable one. After this examination, the result of which was not made known to the executors, the bargain was closed.

It would probably have been wiser for the executors to have delayed selling, for further inquiry and examination; but we can see no sign of bad faith in their conduct. They obtained $10,000 more than Brown would have been willing to accept, and they acted on an estimate which he had acted on, and obtained a price which was not, we think, such as they had not a right to deem sufficient on that estimate. We see no signs of fraud whatever.

The difference between the purchase price and that on the resale was very great, and constitutes about all there is in the record to throw doubt on the fairness of the transaction. But it is abundantly clear that the dealings in such lands were speculative, and in that year quite as much so as ever, if not more so, and that dealings between sharp and well-informed lumbermen showed as great variances in values; and it is not clear from the proofs that the bargain obtained by Mr. Ruggles was one which turned out in the end to have been excessively advantageous.

Upon the whole case, we think no fraud is made out, and that the decree should be affirmed.

SHERWOOD and MORSE, JJ., concurred. CHAMPLIN, J., did not sit.

